# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

                                         Chapter 7

In re PATRISHA S. OSBORNE and
    GEORGE R. OSBORNE,

                                         Case No. 11-38122(cgm)


                        Debtors.

------------------------------------------------------------- x


NOTICE OF MOTION FOR AN ORDER VACATING
THE ORDER APPROVING THE SETTLEMENT OF
THE DEBTOR'S CLAIM IN THIS REOPENED
PROCEEDING, DIRECTING THE U.S. TRUSTEE
TO FILE HIS FINAL REPORT AND ACCOUNT,
DISMISSING THE PROCEEDING, AND ENTERING
A DISCHARGE AND FINAL DECREE


    PLEASE TAKE NOTICE that Patrisha S. Osborne, A Debtor herein,
and George R. Osborne, a Debtor and an Assignee-Creditor herein, upon the
annexed affidavit sworn to on December 18, 2015, and the exhibits annexed
thereto, will make application to this Court, before the Hon. Cecilia G.
Morris, Chief U.S. Bankruptcy Judge, at the U.S. Bankruptcy Courthouse,
355 Main Street, Poughkeepsie, NY 12601, at 9:30 a. m. on the 26th day of
January 2016, or as soon thereafter as counsel and the parties may be heard,
for an ORDER:


    1. Vacating this Court's order entered on October 9, 2013, pursuant to
Fed.R.Civ.P. Rule 60(b)(6) and Fed.R.Bankr.P. Rule 9024, which order

1

granted the motion of the U.S. trustee and approved a collusive settlement of $50,000 with the insurance carrier of debtor's $5,250,000 attorney malpractice claim, on the ground that the facts underlying said order have changed, the attorney malpractice claim which is the subject matter of the settlement agreement no longer exists, the time to bring any legal action to enforce such claim has expired, and there is no known authority under the Bankruptcy Code for the Court to approve and direct the payment of funds to a U.S. chapter 7 trustee where the claim is non-existent, performance of the agreement is impossible, and both parties and the contract have been discharged.[1]

2.   Directing the chapter 7 trustee assigned to this matter, pursuant to 11 U.S.C. § 704(a)(9), to prepare and file his final report and his final account of his administration of the Estate with the Court, with the United States Trustee, and with the debtors.

3.   Dismissing this case, pursuant to Fed.R.Bank.P. Rule 1017, after the hearing provided for in this motion, on the ground that this Court, in an in-court ruling on November 27, 2012, and an order entered on December 13, 2012, granted the motion of a U.S. chapter 7 trustee and reopened this proceeding "for the limited purpose" stated in her ruling, "of administering a newly discovered asset", and since the facts reveal that neither the Judge nor the U.S. trustee ever administered or intended to administer the asset, and the asset itself no longer exists, and there are no other assets in the chapter 7

---

[1]   Local Rule 9023-1, Comment, of the Rules of the Bankruptcy Court for the Southern District of New (December 2015 edition), states that it "does not apply to motions" under Fed.R.Bankr.P. Rule 9024, and, in any event, this is a <u>motion to vacate the order</u> entered on October 9, 2013, approving the settlement herein, it is not a <u>motion to reargue the decision</u> entered on October 3, 2013, and the Bankruptcy Judge is requested to respect the difference in her decision.

Estate, this proceeding is not only unnecessary but is meaningless and should be dismissed.

    4. Issuing an order of discharge of the Debtors and the entry of a final decree, pursuant to 11 U.S.C. § 727(a).

    5. Together with such other and further relief as to the Court may seem just and proper.

    **PLEASE TAKE FURTHER NOTICE** that, responsive papers, if any, should be filed with the Court, and personally served upon so as to be received by the undersigned, no later than seven (7) days prior to the date set forth herein above.

Dated:  Elizaville, NY
       December 18, 2015

By: _____
    PATRISHA S. OSBORNE
      Debtor, Pro Se

_____
    GEORGE R. OSBORNE
    Debtor, Pro Se and
     Assignee-Creditor
    692 County Route 2
    Elizaville, NY 12523
      845-756-3799

TO:  Oxman Tulis Kirkpatrick
     Whyatt & Geiger LLP
   120 Bloomingdale Road
   Suite 100 White Plains, NY 10605
   Attn: Stuart E. Kahan, Esq.
       Attorney for U.S. Chapter 7 Trustee

**Tulis Wilkes Huff & Geiger LLP**
**220 White Plains Road**
**2nd Floor**
**Tarrytown, NY 10591**
**Attn: Mark S. Tulis, Esq.**
        **U.S. Chapter 7 trustee**

**Colliau, Carluccio, Keener, Morrow**
    **Peterson & Parsons**
**333 South Wabash Avenue, 25th Floor**
**Chicago, IL 60604**
**Attn:  John F. Maher, Esq.**
        **Attorneys for Continental Insurance Company**
        **(A subsidiary of CNA Financial Corporation)**

**Marin Goodman, LLP**
**500 Mamaroneck Ave., Suite 501**
**Harrison, NY 10528**
**Attorneys for Genova & Malin, Esqs.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x

                                              Chapter 7

In re PATRISHA S. OSBORNE and
       GEORGE R. OSBORNE,

                                         Case No. 11-38122(cgm)

                           Debtors.
------------------------------------------------------------- x

**DEBTORS' AFFIDAVIT IN SUPPORT OF MOTION**
**FOR AN ORDER VACATING ORDER APPROVING**
**SETTLEMENT OF DEBTOR'S CLAIM, DIRECTING**
**THE U.S. TRUSTEE TO FILE A FINAL REPORT AND**
**ACCOUNT, DISMISSING THE PROCEEDING, AND**
**<u>ENTERING A DISCHARGE AND FINAL DECREE</u>**

STATE OF NEW YORK    )
                         )  ss.:
COUNTY OF DUTCHESS   )

     Debtors Patrisha Osborne and George Osborne, being duly sworn, depose and state:

     1. This affidavit is submitted in support of debtors' application to this Bankruptcy Court for an order (a) vacating the Court's order dated October 3, 2013 approving the U.S. trustee's settlement of the attorneys' malpractice claim with the offending attorney's insurance carrier; (b) directing the U.S. trustee to file a final report and account; (c) dismissing this chapter 7 proceeding; and (d) issuing a discharge and final decree.

1

2. This motion is made by the debtor, Patrisha Osborne, and the debtor George Osborne, who is, by assignment, also a creditor of the estate. This Court has found it convenient to reject any application, motion, request, or otherwise by debtors on the ground that debtors "have no standing" as regards any challenge to the Court's order of settlement. However that may be, the debtor is also a creditor and has standing. A copy of the assignment and proof of claim are attached. [1]

## Eight Reasons This Proceeding Has Not Been Terminated.

3.    This Court continues to have jurisdiction to hear this motion, and further Court rulings are required in this reopened chapter 7 case. There are at least eight specific legal reasons why this bankruptcy proceeding, contrary to the chapter 7 trustee's assertions, did not terminate upon the entry of the court's order approving the trustee's settlement for a mere $50,000. That order approved the terms of the settlement, but the actual closing, reflecting the settlement provisions, has not yet taken place.

4. First, the Court's own memorandum decision granting trustee's motion to approve the settlement, entered on October 3, 2013, states explicitly that the case continues and, indeed, "The trustee has not yet completed discovery in this matter". (ECF No. 107, p. 6).[2] Likewise, the debtors also have not yet completed discovery.

5. Second, in the Court's order entered on October 9, 2013, the Judge

---

1. A copy of the assignment and the proof of claim were filed with the Office of the Clerk on October 15, 2015, and are annexed as Exhibit "A". (ECF No. 127) The debtor is also the creditor with the largest single claim. The Clerk has failed to include the proof of claim in the Claims Register.
2.  Memorandum decision approving trustee's motion to confirm the settlement of the malpractice cause of action, entered October 3, 2013, is annexed as Exhibit "B".

2

deleted from the trustee's proposed order the trustee's attempt to immediately grab the $50,000 settlement money from the insurance carrier. (ECF No. 115).[3] There is presently no order directing the trustee to request, or permitting the trustee to receive, the sum of $50,000 from the insurance carrier, and the "settlement" amount has not yet been paid to the trustee.

6.    Third, the trustee must prepare and file with the Court a final report, and a final account of his administration of the estate, pursuant to 11 U.S.C, § 704(a)(9).

7.    Fourth, most certainly the trustee will file with the Court his application requesting an award of trustee's fees and lawyer's fees.

8. Fifth, by the Court's own Notice, dated October 20, 2015, sent by the Clerk at the direction of the U.S. trustee, all creditors who believe they have an unsecured claim that has not been filed, have until January 22, 2016 to file a proof of claim.[4] Until that date the U.S. trustee will not know the identity or the amount of the claims, and cannot prepare any proposed distribution to the creditors, assuming there is anything left to be distributed after the trustee and the lawyers get their fees.

9. Sixth, there also remains the Court's issuance of an order of discharge and final decree, pursuant to 11 U.S.C. § 727(a).

10.  Seventh, the trustee's attorney, Stuart E. Kahan, Esq., not

---

3.  The order approving trustee's motion to confirm settlement of the malpractice cause of action, entered October 9, 2013, is annexed as Exhibit "C".
4.  Notice to Creditors, from Clerk of the Court, dated October 20, 2015, is annexed as Exhibit "D".

previously known to be delusional, asserts that this proceeding is closed and over and done and finished, because the Court approved the settlement two years ago, and as a result, he claims, debtor is not entitled to make any applications to the Court. At the same time he acknowledges the case is <u>not</u> closed because it remains for the Court to take the necessary steps "to close this matter".[5] Only the legal claim for malpractice has been terminated, by expiration of the statute.

11. Eighth, in addition to the reasons set forth above, the Bankruptcy Court must vacate the order of October 9, 2013 because there is no legal basis for a Bankruptcy Court to enforce an order of settlement where the subject of the settlement no longer exists. The destruction of the debtor's cause of action has made it impossible for the trustee to perform his part of the agreement, and therefore the insurance company is discharged from paying the trustee any amount, and it has put an end to the agreement.

<u>The Factual Background Is At The End Of This Affidavit</u>

12. Set forth at the end of this affidavit, in paragraphs 32 through 46, is an outline of some the factual and legal background in which the misbegotten settlement and approval order came about. On this motion, neither the chapter 7 trustee nor the Bankruptcy Judge need any further recitation or reminder of the basic elements of their brazen scheme to protect and to insulate their good friend, attorney Thomas Genova and his law firm, from all liability in debtor's $5,250,000 malpractice action. The outline is set forth below <u>for the record</u> and for those persons, including the creditors, who have shown a direct interest in the development of this case over the years.

---

5. Letter, Stuart E. Kahan to George R. Osborne, dated October 19, 2015, annexed as Exhibit "D".

4

**Impossibility Of Performance Discharges The Parties and Ends The Contract**

13. The settlement agreement, between the chapter 7 trustee and the malpractice defendant's professional liability insurance carrier, provides that the insurance carrier agreed to pay the trustee $50,000 and the trustee agreed to accept that sum in full settlement of debtor's malpractice claim against the carrier's insured.

14. There certain undisputed facts pertaining to this "Agreement".

(a)   The parties agreed that the subject of the agreement was a malpractice claim against an attorney.

(b)   The parties agreed to settle the claim, but the settlement never took place. The Court approved the settlement, but in its October 9, 2013 order, and in its earlier decision, the Court made clear the case is not settled, nor is it even ready for settlement, for "discovery" remained, and the order specifically prohibited the trustee from taking the $50,000 from the insurance carrier until the settlement takes place.

(c)   The parties understood that the subject of the agreement had a certain time limit, or life span, namely a three year statute of limitations, measured by the period between the date a viable malpractice claim first existed and the date it expired by operation of law.

(d)   There is no dispute that debtor's claim for malpractice no longer exists, as a matter of law, because the three year statute of limitations has expired.

(e)   It should also be undisputed that the reason the subject of the agreement no longer exists, therefore, is not the fault of either party.

5

(f)   The parties also knew that, in fact, the legal claim for attorney malpractice would never be litigated in any court at any time. It was a phantom from day one.

(g)   The trustee knew this because he was a party to the collusive agreement with the Bankruptcy Judge and the malpractice defendant, Genova, which agreement required that the claim would remain in the Court's chapter 7 estate until it died, either by settlement or by statute.

(h)   The insurance carrier's attorney likewise knew that he and his client would never be called upon to defend the claim in court, or elsewhere, because during the course of three years of discussions, which the trustee's lawyer has acknowledged took place, he knew and understood that the trustee did not bring and could not bring the lawsuit, and he understood that the trustee did not even bother to evaluate the merits of debtor's claim. He understood that the claim was as dead as a dodo.

(i)   There are other unusual, if not anomalous, features of the case. The trustee's attorney has represented to debtors that there is "no written agreement" between the parties evidencing the settlement. He is settling a $5,250,000 claim for $50,000, and, he says, there is no agreement in writing evidencing the intended settlement!

(j) Although the subject of the agreement no longer exists, the trustee is not claiming nor even acknowledging that the parties are legally discharged and the contract is unenforceable and has been eliminated as a viable legal agreement because of the impossibility of performance. Oh No! He wants the contract enforced and he wants the $50,000, even though he has nothing to give the insurance carrier in return.

(k)   The insurance carrier's attorney takes the same position, and likewise does not say the carrier is excused from performance and has no

6

obligation to pay the trustee anything, because there is no claim against the carrier. Oh No!   For his part, he continues to look toward the settlement where he will pay $50,000 and the company he represents will receive nothing.

**The Decisional Law On Impossibility Of Performance Is Clear and Consistent, And None Of It Contemplates what These Lawyers Are Up To.**

15. Even without a written agreement, it is basic contract law that where performance of the subject of a contract becomes impossible, as a consequence of the destruction of the subject matter of the agreement, without the fault of either party, both parties are discharged under the contract. Buffalo and Lancaster Land Co. v. Bellevue Land and Improv. Co., 165 N.Y. 247; 1901 N.Y. LEXIS 1412; Lorillard v. Clyde, 142 N.Y. 456; 1894 N.Y. LEXIS 776;  International Paper Co. v. Rockefeller, 161 A.D. 180, 146 N.Y.S. 373 (1914). And see: Taylor v. Caldwell, 3 Best + S. 826 (1863).

16.   The existence of debtor's cause of action, which has been kept entirely in the hands of the trustee and Judge Morris for over three years, since the Judge took the action away from debtor to "administer" it herself, is an implied condition of the agreement to exchange the malpractice action for money. When the cause of action ceases to exist there is an impossibility of performance, and both parties are discharged from all obligations. The destruction of the subject of the agreement puts an end to the contract. Stewart v. Stone, 127 N.Y. 500; 1891 N.Y. LEXIS 1805; Chateau Rive Corp. v. Enclave Development Assocs., 22 A.D.3d 447, 802 N.Y.S.2d 211; 2005 N.Y. App. Div. LEXIS 10596.

17. **Without the subject of the agreement, it is legally as if no contract was ever made:**

> "When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is *prima facie* regarded as dissolved. The contingency which has arisen is treated . . . as being one about which no bargain at all was made." Nitro Powder Co. v. Agency of Canadian Car and Foundry Co., 233 N.Y. 294; 922 N.Y. LEXIS  874.

Accord: W.K. Ewing Co., Inc. v. New York State Teachers' Retirement System, 14 A.D.2d 113, 218 N.Y.S.2d 253; 1961 N.Y. App. Div. LEXIS  9351; Henry Freund v. Zephyr Laundry Machinery Co., 180 Misc. 249, 39 N.Y.S.2d 250; 1942 N.Y. Misc. LEXIS 2319; Port Aux Quilles Lumber Co. Inc. v. Meigs Pulp Wood Co., Inc., 204 A.D. 541, 198 N.Y.S. 563; 1923 N.Y. App. Div. LEXIS 9515.

18. **Where the subject no longer exists, impossibility excuses the performance of an executory contract.** Univ. of Minnesota v. Agbo, 176 Misc.2d 95, 673 N.Y.S.2d 812 (App. Term 1998); Sokoloff v. National City Bank of N.Y., 208 A.D. 627, 204 N.Y.S. 69 (1st Dep't 1924).

19. **One textbook writer put it this way:**

> Where the duty [of performance] is excused by destruction of the specific subject matter [of the agreement], both parties are discharged under the contract.[6]

---

6. Simpson On Contracts, 2d Ed., p. 361, West Pub. Co. 1965.

20.  Where performance becomes impossible because of a change in the law (herein, after 3 years the claim expired by act of law) performance is excused. In re A&S Transportation Co. v. County of Nassau, 154 A.D.2d 456, 546 N.Y.S.2d 109; 1989 N.Y. App. Div. LEXIS 12463; Metpath, Inc. v. Birmingham Fire Ins. Co of Penna., 86 A.D.2d 407, 449 N.Y.S.2d 986; 1982 N.Y. App. Div. LEXIS 15729; Lucy E. Doherty v. Monroe Eckstein Brewing Co., 115 Misc. 175, 187 N.Y.S. 633; 1921 N.Y. Misc. LEXIS 1265;  Bown Brothers, Inc. v. Merchants Bank of Rochester, 214 A.D. 693, 213 N.Y.S. 146; 1925 N.Y. App. Div. LEXIS 10598; Town Of North Hempstead v. Public Service Corp. of Long Island, 107 Misc. 19, 176 N.Y.S. 621; 1919 N.Y. Misc. LEXIS 736.

21.  There is no provision in the Bankruptcy Code or the Rules of Bankruptcy Procedure authorizing this Court to enforce a non-existent contract. It is extinct. If the trustee nevertheless seeks to obtain his $50,000, and the Court on some obscure basis agrees, it has an obligation to require him to provide written documentation establishing his right to the funds.

### A Public Corporation Is Giving Away $50,000 For Nothing

22.  In the event the malpractice insurance carrier intends to pay the trustee $50,000, even though there is no malpractice claim to settle and the carrier will receive nothing in return, the question arises as to whether the shareholders of CNA Financial Corporation, a publicly traded corporation, or its subsidiary, Continental Casualty Company, the carrier involved in this case, are aware that the company's management or its attorneys, or both, are giving away $50,000 for nothing. Do the filings with the SEC reveal that CNA Financial Corporation's subsidiary is engaged in such business practices?

Such an all-too-cozy arrangement does not pass the smell test. The smell is not a recent development. Actually it goes back three years .[7]

23.  If the insurance carrier's attorneys take the position that it has no obligation today to pay the trustee any amount (under contract law that is precisely what they should say), in such event this raises the question of where the trustee is going to get his $50,000?  As shown in paragraph 8 above, the trustee has stated in his communications to the Clerk of the Court and, in turn, to the creditors, months after the cause of action and any claim ceased to exist, that "a dividend to creditors now appears possible", and proofs of claim should be filed. Where is that money coming from to pay the "dividend"?

24. The Court is urged to vacate the settlement order of October 9, 2013, direct the trustee to file his report and his account and get on with the closing of the case and discharging debtors.

<u>What Is Left In This Case For The Creditors?</u>

25.  Under the existing settlement, how much is available to the creditors?  The sum payable to the trustee, assuming this motion is denied, is $50,000, but that money does not go to the creditors. The trustee will make application to the Bankruptcy Judge for an award of trustee's fees and

---

7. The representatives of Continental Casualty Company, or its parent, cannot say they have been suddenly and unexpectedly made aware that "Oh my gosh; there is no claim to settle because the statute expired!" The carrier's representatives have known since day one, in 2012, that the U.S. trustee, Mark S. Tulis, was so conflicted and compromised, and the malpractice defendant Genova, their insured, was so well protected by the Bankruptcy Judge, that it was understood all during these three years that <u>no malpractice action was ever going to be brought by the chapter 7 trustee, or any one else, in this proceeding</u>. There was never going to be a claim to settle as long as the Judge and the U.S. trustee kept the claim locked up in storage! They could have "agreed" to give the trustee <u>nothing</u> and the trustee would have told the Bankruptcy Judge that is all the case is worth, and she would have agreed, and ordered a zero settlement. The $50,000, or any other amount, has been a cosmetic give-away by the insurance carrier throughout. Why?

lawyer's fees. On an hourly basis, for over three years, the amount payable to the trustee's attorney, who is also his law partner, could easily total $250,000, and counting.

26. The Judge will award an amount, in her discretion, only partially limited by the Bankruptcy Code, which could total the entire $50,000. Such an award is not likely. It looks bad, and the trustee has claimed since 2013 that his settlement is "good" because it at least gives the creditor's "something".

27. The thinking here is that the award is likely to total at least $40,000, leaving $10,000 for the creditors. (The trustee and his lawyer will, of course, be warmly embraced by Judge Morris for their "exemplary services" to the Court!). The creditor's claims are said to total $143,815.40. If $10,000 is available to allocate among $143,815.40 of claims, this means a payment to creditors of 7 % of the amount of each claim. Thus, if a creditor has a claim of, say, $2,500, (and the majority of the claims are less than that) he could receive $ 175.00.[8] That is all this is about, for the creditors.

28. It is apparent that the trustee's and the Judge's refusal to permit the malpractice lawsuit, which would surely have resulted in a recovery well in excess of $143,815.40 has severely hurt the creditors.

29. Throughout this long case the trustee has failed to represent the creditors, which is his primary legal responsibility under the Bankruptcy Code. In compliance with the Judge's objective, he failed to bring the action

---

[8] Two claims, including one just assigned to the debtor, are loans from personal friends and former clients, and they total $104,126. All of the other 17 claims combined total less than $40,000.

against his friend Genova; he violated a host of other provisions of the Code and of the U.S. Trustee Program; he refused even to let the U.S. Trustee hold a meeting of creditors; the list of his illegal actions could be extended. For this he and his lawyer could receive perhaps $40,000!

30.   The debtor, George Osborne, has spoken personally with some of the creditors. At least half are trade creditors with small claims; many became friends of the debtors. Each has expressed a conviction that on this record it is an outrage to give the trustee anything! "He refused to bring the malpractice action, he should get nothing". "He gets an award for intentionally doing nothing, and we get crumbs", another has said.

31. When it is also explained that the settlement agreement is now history, because the trustee has made sure the claim has expired by law, and that the malpractice insurance company has no legal obligation to pay anything, the award of monies to the trustee is seen as even more objectionable, and inexplicable. Creditors who have spoken with debtors recognize that if the motion to vacate the settlement order is granted, no one will receive anything. In such event, however unlikely, most are willing to forego their small-change, left-over payment, and have the trustee receive nothing.

## The Factual and Legal Background

## The Law Firm's Negligence and Malpractice

32. In August 2011 debtor, Patrisha Osborne, retained the law firm of Genova & Malin to file a chapter 11 bankruptcy case and to prepare and have

confirmed a plan of reorganization to stop a pending foreclosure proceeding. The attorneys' documented and undisputed negligence, in failing even to prepare a competent motion for the simple purpose of obtaining additional <u>time to file</u>, was denied and the proceeding was dismissed in less than two months.[9]

33.   Debtors then filed this chapter 7 bankruptcy case in November 2011; it was completed and dismissed in December 2011 when the former chapter 7 trustee, who had been informed by debtors at the 11 U.S.C. § 341 meeting of creditors of the attorneys' incompetence and negligence, correctly termed it a "no asset" case,[10] and debtors were discharged from personal liability in March 2012.

34.   Debtor suffered no damage and, therefore, at the time of filing their petition, they had no cause of action against the attorneys based only on "negligence" at the time of filing their chapter 7 petition. But when her ongoing efforts to find another lender all failed, a foreclosure took place in January 2012 and debtor lost her farm and business, and for the first time suffered the damages required for a viable lawsuit.

35.   Debtor began a malpractice action against the Genova law firm in September 2012, in the State Supreme Court and, later, renewed the claim as

---

9.   Experienced attorney malpractice trial lawyers, after reviewing the facts and the hopelessly inadequate legal papers filed by debtor's attorney in support of their 2011 motion, (they failed to file a single financial document pertaining to their client, the debtor, and that was only for openers), have suggested that Genova was very content to take debtor's $10,000 retainer, to file a perfunctory motion which he knew would be denied, and when the case was then dismissed, to throw the debtor into a chapter 7. In the language of the fight game: "He took a dive". The facts are entirely consistent with this analysis.
10.   The Clerk of this Court did not enter the trustee's report in the Docket or assign it an ECF number. The Docket, on p. 8, merely has an entry that on "12/13/ 2012", the trustee was "terminated from case".

13

an adversary proceeding in the Bankruptcy Court in the Northern District of New York, where debtors reside.

36. A campaign then began to permanently destroy the malpractice claim. At one time or another, four U.S. trustees, together with Genova's own attorneys, worked to have any and all actions brought by debtor dismissed no later than November 26, 2012. The initial chapter 7 trustee had made a motion to reopen debtors' chapter 7 proceeding, returnable in this Bankruptcy Court on November 27, 2012. It was imperative to the trustee, and to Bankruptcy Judge Morris, that any proceedings brought by debtor be dismissed by November 26, 2012, in order for Judge Morris to hold a hearing as scheduled on November 27, 2012, the following day. Her hearing could not have gone forward if any prior proceeding was still pending.[11]

<u>The Judge Creates The "Takeover"</u>

37. Accordingly, on November, 27, 2012, at the hearing, as scheduled and as planned, Judge Morris ordered the reopening of debtors' former chapter 7 proceeding, and the Judge took away debtor's malpractice cause of action and put it in the Court's chapter 7 "Estate". At that moment, the claim legally belonged to the Court and the trustee, not the debtor. It remained in the Estate until it died in 2015 – unexamined, unenforced, and unmourned.

---

11. Even the U.S. Bankruptcy Judge for the Northern District, Hon. Robert E. Littlefield, Jr. and the U.S. standing trustee in his court, were involved in the project and, at someone's request, that Judge held a dismissal hearing in his Court in Albany on Monday, November 26, 2012. Debtors were given a day and one half notice of the hearing and of the allegations said to support dismissal. The motion papers were served by FedEx delivery, on Saturday November 24, 2012, and this was over the Thanksgiving weekend! The Judge's law clerk had previously advised debtor that a motion to dismiss their case would be brought, and that the Judge understood and had told her that the motion to dismiss debtor's case could not be adjourned and <u>must</u> be heard no later than November 26, 2012. Notice of a day and a half, over a holiday weekend really made no difference. The motion to dismiss the chapter 11 case was decided before it was ever prepared.

38. The Plan from the beginning was for the Judge to order a takeover of the malpractice claim and to keep it in the Estate permanently. The former chapter 7 trustee who made the motion to reopen saw what was going on and he wanted out so he resigned, and a new and compliant chapter 7 trustee, one Mark S. Tulis, Esq., was brought in. He understood that as to the malpractice claim, he was to do <u>nothing</u>, regardless of his obligations under the Bankruptcy Code. He knew his place, and so he did <u>nothing</u>, and he instructed his attorney to do <u>nothing</u>.

39. Why this intent to destroy?  Debtor's claim was against the firm of Thomas Genova, who operates the largest bankruptcy law firm anywhere from New York City to Albany. He is a long-time personal friend of the Judge, runs her annual bankruptcy conference, and is the Court's "main man". On any given hearing day, his firm has half the matters on the calendar.

40.  The events since November 2012 were designed to protect Genova and his firm from debtor's malpractice action. The new chapter 7 trustee not only understood this but, in addition, Genova was a personal friend of his, and also was a chapter 7 trustee in the same Judge's court. The trustee has acknowledged that he has worked with his friend Genova on previous bankruptcy cases. The relationships of the participants in this proceeding, across the board, reveal not merely what is a "conflict" beyond description, but more accurately could be called "incest".

15

**The Bankruptcy Judge's Handling Of This Affair Effectively Denied
Debtors The Opportunity To Obtain Counsel To Represent Them**

 41.  Due in good part to Genova's efforts, the small and clubby world of
bankruptcy attorneys soon became aware of what was happening in Judge
Morris's court.   As a consequence, debtors were unable to find <u>anyone</u> to
represent them. Debtors spoke with eight bankruptcy attorneys, from New
York City to Albany, and every one refused to represent them. They each
stated that they knew Genova, they knew the chapter 7 trustee Tulis, they
knew Judge Morris, and they appeared in her court in their own bankruptcy
practice. Even a college fraternity brother of one of the debtor's feared to
become involved and represent them. Judge Morris has them all intimidated
and fearful that representing the debtors would lead to retaliation affecting
their livelihoods.

**The Judge Then Creates The "Settlement"**

 42.  Many months later the U.S. District Judge handling debtor's appeal
of the takeover order, at an in-court conference, discovered that the trustee
had done nothing to examine debtor's cause of action and to evaluate its
merits. (His attorney admitted on the record that he and the trustee had done
<u>nothing</u> except to talk to the insurance carrier about a settlement.) The Judge
directed the trustee's lawyer to act, not just sit on the claim and do nothing.[12]

---

12.  Before he became aware of what was going on in the Bankruptcy Court, The District Judge innocently
told the trustee's lawyer that he had two choices. He must "fish or cut bait"; bring the malpractice action or
abandon it. When debtor apprised the Judge that there was a third choice operative here, which was to "do
nothing" until such time as the trustee could apply to the Bankruptcy Judge for approval of a "settlement"
with the malpractice insurance carrier, in some minimal amount.  No matter how inadequate the amount, the
trustee knew it would be approved, because that was the plan. When the District Judge realized that debtor
was showing him the facts which revealed that "the fix is in", he ran for cover.

 The Judge assured the parties that what debtor was saying was just "something out of a crystal ball" and
he didn't like crystal balls, and also that he certainly knew of "no attorneys" who would participate in such
an improper scheme.  (Transcript, in-court conference, U.S. District Court, SDNY, June 13, 2013, ECF No.
113) This disclosure to the Judge assured that debtors' appeal would be denied and the takeover order would

43. And, sure enough! Months later the trustee made a motion to have the Bankruptcy Judge approve the expected settlement for $50,000, as the "best" amount that he said he could obtain from the insurance carrier. It was approved by this Court's order entered on October 9, 2013, which is the subject of this motion to vacate.

<u>The Malpractice Claim Expires And Dies</u>

44. Debtors appeals of both the "takeover" and the "settlement" orders were delayed and delayed and delayed throughout, by the courts and the trustee. The malpractice claim, even with tacking for the periods of time when the claim was pending in 2012, expired in July 2015, with the claim still buried in the Estate, awaiting "settlement". At that time, debtor had a petition for certiorari pending at the Supreme Court of the United States which she withdrew as moot because there was no longer any viable malpractice cause of action.

45. With another Bankruptcy decision anticipated on this motion, the reader should be aware that the Judge has previously revealed a remarkably distant relationship with the truth. For example, in debtors' opposition, dated September 23, 2013, to trustee's motion for approval of his settlement, one of the exhibits submitted was statements from creditors holding over 90% of the total amount of the claims, in which they objected to the settlement. (ECF No. 102, Exhibit "U".) The decision approving the settlement, entered October 3, 2013, was one in which Judge Morris apparently chose to look the other way, for she wrote that "No creditor has filed opposition to the motion". (ECF No.

---

be affirmed by the District Court. (The final settlement took place in October 2013, in the manner and in the precise amount debtor had predicted. And debtor didn't get his prediction from a crystal ball. The prediction was based on the facts of the case).

17

106, p. 8).  What better way is there to deal with creditors objections than to deny that they even exist?  As Bob Dylan wrote, "Look out kids, they keep it all hid".

46.  For the debtors, there has never been a level playing field in this case. At a hearing on June 4, 2013, on debtors' motion to dismiss the "takeover" order or convert the case, the Judge invited the trustee to bring on a motion, by order to show cause, requesting the Court to impose a monetary sanction on the debtors under Rule 9011, because she objected to the substance of the motion. (Transcript of Hearing, ECF No. 81). When you don't like the message a party is setting forth in a motion, it is not sufficient to simply reject what is being urged. The Judge finds it more desirable to "shoot the messenger" by assessing a fine. The trustee's attorney declined the invitation.

47.  <u>Required Notice To Creditors</u>.   This motion involves debtors' application to vacate the settlement order and to dismiss the proceeding and, pursuant to Fed.R.Bank.P. Rule 2002(a), a notice of at least 21 days has been sent to all creditors and to the U.S. trustee, and interested non-parties.[13]

48.  The names and addresses of the creditors to whom the notice was sent were taken from the identical list of creditors which this Court referred to in her decision entered on October 3, 2013 (as well as the later order dated October 9, 2013), granting the settlement and denying standing to debtors to object or appeal. The decision stated that there are "$128,643.51 in total

---

13.  A copy of debtors' Notice To Creditors, dated December 17, 2015, is annexed as Exhibit "F".

claims", (ECF No. 107, p. 3), and these are the same claims as are set forth in the Court's Claims Register.

49.   Subsequent to the above-referenced Notice sent to creditors by the Clerk of the Court on October 20, 2015, concerning a "dividend" from the Estate, five additional proofs of claim have been filed. Three of these claims are a duplication of the same claim the same creditor had already filed. The Office of the Clerk apparently does not examine a proof of claim or look at the Register, for the Office simply filed the proofs of claim, and added the amounts of the claims to the total. With these duplications, the claims are now said to total $143,815.40.

50. It is requested that the Court enter an order as set forth in the annexed Notice of Motion.

PATRISHA S. OSBORNE
Debtor, Pro Se

GEORGE R. OSBORNE
Debtor, Pro Se and
Assignee-Creditor

Sworn to before me this
18th day of December, 2015

JACQUELINE N. MARTINS
Notary Public, State of New York
Reg. #01MA6318071
Qualified in Dutchess County
Commission Expires

19